**KENTUCKY BRIDGE & DAM, INC., Plaintiff,**

**v.**

**UNITED STATES, Defendant.**

No. 93–744C.

United States Court of Federal Claims.

Nov. 18, 1998.

Richard W. Schwartzman, Kutak Rock, Washington, D.C., attorney of record for plaintiff.

Alfred S. Irving, Jr., Commercial Litigation Branch, Civil Division, Department of Justice, Washington, D.C., with whom were Anthony H. Anikeeff, Assistant Director, David M. Cohen, Director and Frank W. Hunger, the Assistant Attorney General, attorneys of record for the defendant.

## OPINION

HORN, Judge.

In the law suit as filed, plaintiff seeks damages for a cardinal change/breach of contract or, in the alternative, for monies allegedly owed from an unsettled equitable adjustment claim and a claim for termination for convenience settlement costs, plus interest. The above-captioned case comes before the court on the defendant's motion to dismiss Count I of the complaint pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims (RCFC), and on the defendant's motion for summary judgment on Counts I and II of the complaint pursuant to RCFC 56. The plaintiff entered into a pipeline corrosion control contract with the United States that involved the cleaning, preparing and painting of an approximately 15-mile long pipeline on the island of Guam. The plaintiff filed suit in this court, upon the government's termination for convenience and after an impasse and numerous attempts to achieve a negotiated settlement. Throughout the administrative and judicial proceedings, the parties have had difficulty negotiating with each other. Late in the proceedings, perhaps as a sign of frustration, the plaintiff requested ADR while at the same time in response to defendant's motion for summary judgment and in oral discussions still insisted that a trial was appropriate. The defendant filed an opposition to the request for ADR. Moreover, the parties never have shown an ability to work together or to agree on whether the case could be settled, whether summary judgment was appropriate and certainly disagree as to the impact of prior related proceedings. Furthermore, the joint stipulation of facts, finally achieved by the parties after trying and difficult negotiation do not include many of the important facts and events necessary to fully delineate what occurred on this contract prior to filing of the lawsuit and in connection with the related Miller Act suit.

## FACTS

On September 20, 1990, the United States Air Force awarded Contract No. F64133–90–C0015 to Kentucky Bridge & Dam, Inc. (Kentucky).[1] The firm-fixed contract price was $1,215,000.00, with a performance period of 540 days. The contract was separated into two project portions, (AJJY 86–2013 and AJJY 86–2016), both entitled "Corrosion Control of Cross Country POL Pipelines" in the United States Territory of Guam, Andersen Air Force Base, that were to be undertaken from the Navy Air Station to Y–Sengsong Road and from Y–Sengsong Road to Andersen Air Force Base.[2] In accordance with contract specifications, corrosion control on the approximately 15–mile pipeline was to be undertaken, inter alia, by "blasting, cleaning, and painting the POL pipelines."

The contract specifications for both portions of the pipeline regarding the Finishes and Painting of the POL Pipeline stated in Section 9A of the contract that:

1. SCOPE: This section includes the requirements for material selection, surface preparation and application of protective coating for the exterior surfaces of the above ground and exposed POL pipelines including steel pipe supports.

\* \* \*

5.4.2.2.1 Damage Surfaces: During blasting operation the Contractor shall carefully examine the newly blasted surfaces and

---

1. Although the caption and all papers filed in the case by plaintiff, read Kentucky Bridge and Dam, Inc., the signature page of the contract reads Kentucky Bridge and Dam Painting, Inc.

2. The term "POL" is an abbreviation for "petroleum, oil, lubricant."

shall notify the Contracting Officer immediately upon discovery of any deep pits, voids and other surface imperfections. Upon verification of the damaged surface by the Contracting Officer, the Contractor shall treat the damaged surface as directed. Pitted areas or voids $\frac{1}{8}$ inch deep or more shall be Fill Welded or Patch Welded using 8″ long by 4″ wide cut piece from 8″ diameter schedule 40 steel pipe. Other damaged surfaces less than 1/8″ deep shall be treated by application of epoxy cement conforming with specs DOD-C-24176. No damaged surface shall be repaired unless inspected by the Contracting Officer.

The Statement of Work section of the contract specifications, specifically in the Construction Features paragraph of the contract for the first project portion, from the Navy Air Station to Y–Sengsong Road, required:

j. Fill-welding or patch-welding (before application of primer) pits $\frac{1}{8}$ inch deep or deeper at about 60 locations, exposed after blasting and cleaning, as noted in Section 9A (Painting of POL Pipeline) paragraph 5.4.2.2.1 of this specifications.

k. Filling with epoxy cement (before application of primer) pits less than $\frac{1}{8}$ inch deep at about 120 locations, exposed after blasting and cleaning, as noted in Section 9A (Painting of POL Pipeline) paragraph 5.4.2.2.1 of this specifications.

The contract specifications for the second project leg, from Y–Sengsong Road to Andersen Air Force Base, likewise in the Construction Features paragraph of the contract, required, but detailed a lessor number of locations, as follows:

j. Fill-welding or patch-welding (before application of primer) pits $\frac{1}{8}$ inch deep or deeper at about 40 locations, exposed after blasting and cleaning, as noted in Section 9A (Painting of POL Pipeline) paragraph 5.4.2.2.1 of this specifications.

k. Filling with epoxy cement (before application of primer) pits less than $\frac{1}{8}$ inch deep at about 80 locations, exposed after blasting and cleaning, as noted in Section 9A (Painting of POL Pipeline) paragraph 5.4.2.2.1 of this specifications.

In Section F, Contract Clauses, the parties incorporated, among other standard clauses, as contract clause No. F–66, 48 C.F.R. § 52.243–4, titled "Changes," which states:

CHANGES (AUG 1987)

(a) The Contracting Officer may, at any time, without notice to the sureties, if any, by written order designated or indicated to be a change order, make changes in the work within the general scope of the contract, including changes—

(1) In the specifications (including drawings and designs);

(2) In the method or manner of performance of the work;

(3) In the Government-furnished facilities, equipment, materials, services, or site; or

(4) Directing acceleration in the performance of the work.

(b) Any other written or oral order (which, as used in this paragraph (b), includes direction, instruction, interpretation, or determination) from the Contracting Officer that causes a change shall be treated as a change order under this clause; *provided,* that the Contractor gives the Contracting Officer written notice stating (1) the date, circumstances, and source of the order and (2) that the Contractor regards the order as a change order.

(c) Except as provided in this clause, no order, statement, or conduct of the Contracting Officer shall be treated as a change under this clause or entitle the Contractor to an equitable adjustment.

(d) If any change under this clause causes an increase or decrease in the Contractor's cost of, or the time required for, the performance of any part of the work under this contract, whether or not changed by any such order, the Contracting Officer shall make an equitable adjustment and modify the contract in writing. However, except for an adjustment based upon on defective specifications, no adjustment for any change under paragraph (b) of this clause shall be made for any costs incurred more than 20 days before the Contractor gives written notice as required. In the case of defective specifications for which the Government is responsible, the equitable adjustment shall include any increased

cost reasonably incurred by the Contractor in attempting to comply with the defective specifications.

(e) The Contractor must assert its right to an adjustment under this clause within 30 days after (1) receipt of a written change order under paragraph (a) of this clause or (2) the furnishing of a written notice under paragraph (b) of this clause, by submitting to the Contracting Officer a written statement describing the general nature and amount of proposal, unless this period is extended by the Government. The statement of proposal for adjustment may be included in the notice under paragraph (b) above.

(f) No proposal by the Contractor for an equitable adjustment shall be allowed if asserted after final payment under this contract.

48 C.F.R. § 52–243–4 (1989).

The contract also incorporated by reference in Section F, Contract Clauses, contract clause No. F–78, 48 C.F.R. § 52.249–2, titled "Termination for Convenience of the Government (Fixed Price) Alternate I (Over $100 k)," which states:

TERMINATION FOR THE CONVENIENCE OF THE GOVERNMENT (FIXED–PRICE) (APR 1984)

(a) The Government may terminate performance of work under this contract in whole or, from time to time, in part if the Contracting Officer determines that a termination is in the Government's interest. The Contracting Officer shall terminate by delivering to the Contractor a Notice of Termination specifying the extent of termination and the effective date.

\* \* \*

(d) After termination, the Contractor shall submit a final termination settlement proposal to the Contracting Officer in the form and with the certification prescribed by the Contracting Officer. The Contractor shall submit the proposal promptly, but no later than 1 year from the effective date of termination, unless extended in writing by the Contracting Officer upon written request of the Contractor within this 1-year period. However, if the Contracting Officer determines that the facts justify it, a termination settlement proposal may be received and acted on after 1 year or any extension. If the Contractor fails to submit the proposal within the time allowed, the Contracting Officer may determine, on the basis of information available, the amount, if any, due the Contractor because of the termination and shall pay the amount determined.

(e) Subject to paragraph (d) above, the Contractor and the Contracting Officer may agree upon the whole or any part of the amount to be paid because of the termination. The amount may include a reasonable allowance for profit on work done. However, the agreed amount, whether under this paragraph (e) or paragraph (f) below, exclusive of costs shown in subparagraph (f)(3) below, may not exceed the total contract price as reduced by (a) the amount of payments previously made and (2) the contract price of work not terminated. The contract shall be amended, and the Contractor paid the agreed amount. Paragraph (f) below shall not limit, restrict, or affect the amount that may be agreed upon to be paid under this paragraph.

(f) If the Contractor and the Contracting Officer fail to agree on the whole amount to be paid the Contractor because of the termination of work, the Contracting Officer shall pay the Contractor the amounts determined as follows, but without duplication of any amounts agreed upon under paragraph (e) above:

(1) For contract work performed before the effective date of termination, the total (without duplication of any items) of—

(i) The cost of the work;

(ii) The cost of settling and paying termination settlement proposals under terminated subcontracts that are properly chargeable to the terminated portion of the contract if not included in subdivision (i) above; and

(iii) A sum, as profit on (i) above, determined by the Contracting Officer under 49.202 of the Federal Acquisition Regu-

lation, in effect on the date of this contract, to be fair and reasonable; however, if it appears that the Contractor would have sustained a loss on the entire contract had it been completed, the Contracting Officer shall allow no profit under this subdivision (iii) and shall reduce the settlement to reflect the indicated rate of loss.

(2) The reasonable costs of settlement of the work terminated, including—

(i) Accounting, legal, clerical, and other expenses reasonably necessary for the preparation of termination settlement proposals and supporting data;

(ii) The termination and settlement of subcontracts (excluding the amounts of such settlements); and

(iii) Storage, transportation, and other cost incurred, reasonably necessary for the preservation, protection, or disposition of the termination inventory.

48 C.F.R. § 52–249–2 (Alternate I) (1989).[3]

The contract further incorporated by reference in Section F, Contract Clauses, as contract clause No. F–50, 48 C.F.R. § 52.236–2, titled in the contract "Differing Site Conditions (All over $25 K)," which states:

DIFFERING SITE CONDITIONS (APR 1984)

(a) The Contractor shall promptly, and before the conditions are disturbed, give a written notice to the Contracting Officer of (1) subsurface or latent physical conditions at the site which differ materially from those indicated in this contract, or (2) unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract.

(b) The Contracting Officer shall investigate the site conditions promptly after receiving the notice. If the conditions do materially so differ and cause an increase or decrease in the Contractor's cost of, or the time required for, performing any part of the work under this contract, whether or not changes as a result of the conditions, an equitable adjustment shall be made under this clause and the contract modified in writing accordingly.

(c) No request by the Contractor for an equitable adjustment to the contract under this clause shall be allowed, unless the Contractor has given the written notice required; *provided*, that the time prescribed in (a) above for giving written notice may be extended by the Contracting Officer.

(d) No request by the Contractor for an equitable adjustment to the contract for differing site conditions shall be allowed if made after final payment under this contract.

48 C.F.R. § 52.236–2 (1989).

According to the parties' joint stipulation, Kentucky entered into an oral subcontract with Jericho Painting & Special Coating Co. (Jericho), subsequent to award of the contract, in the amount of $850,000.00, which required the subcontractor to provide "all labor, material, and equipment necessary to perform all field work as required in the specifications of the contract between Kentucky Bridge and the Air Force." From a description in plaintiff's Cost Support Data Submission, it appears that work on the contract started on the pipeline in January 1991.

Shortly, thereafter, in a letter dated April 11, 1991, Kentucky's superintendent Mike Massa informed the contracting officer, John Miller, of problems related to the project:

As you are aware, during our field inspection conducted *today*, we have uncovered many areas of the existing pipeline with limited wall thickness. In significant areas this is limited to 1/16 of an inch. We are presently being forced to alter our initial

3. The joint stipulation of facts submitted by the parties suggest that the relevant termination for convenience contract clause was No. F–77, 48 C.F.R. § 52.249–1, titled in the contract "Termination for Convenience (Short Form) (Under $100 K)." The record, however, indicates that the applicable contract clause for the events in the instant action was No. F–78, 48 C.F.R. § 52.249–2, titled in the contract "Termination for Convenience of the Government (Fixed Price) Alternate I (Over $100 k)," quoted above. This clause was referenced specifically in Modifications No. 4 and No. 5 to the contract.

production schedule. Obviously, this could be deemed an unacceptable safety condition. It is impacting the cost of construction adversely.

Be advised that the government estimate for pipe repair and filling is significantly below the actual requirement found.

We request the government's direction on how to proceed.

The record before the court indicates that the contracting officer subsequently ordered work to stop "pending a decision on how to proceed." In addition, Kentucky, upon request of the government, submitted an estimate that "the extent of the pitting for the entire pipeline would be approximately 600,-000 pits." As part of Modification No. 4, the government included a "Contracting Officer's Statement of Facts for Termination for Convenience Contract F64133–90–C0015 Corrosion Control of Cross Country POL Pipelines—Guam."[4] The contracting officer found "[t]hat the large variation between the estimated amount of pitting contained in the specifications and the actual pitting amounts to a misrepresentation."

On April 15, 1991, the President of Kentucky sent a letter to the Air Force contracting officer, John E. Miller, and his authorized representative, Gerald Miller, that again outlined the problems at the work site for the contractors.

> This letter is to serve as a continuing notice to the government that the above referenced project is being seriously impacted by the government's failure to direct the contractor on how it wishes to proceed.
>
> As you are aware our sandblasting operation is completely shut down at this point. We are estimating a delay cost "to the government" of approximately $8,500. to $10,000. per day that our equipment is left unused.
>
> As you are aware the contract reads on page 9A–5 paragraph 5.4.2.2.1 (Damages Surfaces) as follows:
>
> > During blasting operation the Contractor shall carefully examine the newly blasted surfaces and shall notify the Contracting Officer immediately upon discovery of any deep pits, voids and other surface imperfections. Upon verification of the damaged surface by the Contracting Officer, the Contractor shall treat the damaged surface as directed.
>
> At this time we have received no direction and damage to this contractor is accruing daily.
>
> It appears to our people in the field, that the most feasible solution at this time is for the government to request a change as follows:
>
> A) Reduce the blast requirement form near-white to reduced blast. (This will greatly reduce the adverse safety position we now find ourselves, however, it will not greatly reduce the time needed to complete the project)
>
> B) Institute a pre-blast inspection of the pipe to detect seriously damaged areas of the pipe.
>
> C) Increase the number of pits and voids to be repaired to better reflect the total repair required.
>
> Of course the government is free to choose whatever course of action it desires. We did wish to suggest the solution outlined so that this project can continue with limited interruption.
>
> In closing, let me reiterate, that this condition is greatly impacting the contractor and further recalcitrance on the government's part will impair this contractor's ability to complete the project.

On April 22, 1991, the contracting officer responded to Kentucky as follows:

> 1. In response to your letter dated 11 Apr 91, Base Civil Engineering has, recommended that you can proceed blasting safely as long as both ends of the pipeline being worked on are open to relieve any explosive pressure which may be generated. Base Civil Engineering will handle the arrangements for ensuring that both ends are open by using in-house forces. Liquid Fuels Maintenance will drop the valves at

---

4. It is unfortunate that the government failed to include this document as part of their appendix or submissions for it's motion for summary judgment.

each end of the section you were previously working on.

2. Base Civil Engineering has also recommended you proceed with repairs beyond the quantity specified in the contract and along with Base Civil Engineering keep a close count of the number of repairs.

3. Based on the above recommendations from Base Civil Engineering, you are hereby directed to proceed with the work effort immediately to avoid any further delays.

On May 7, 1991, the project manager for Kentucky, Vernon M. Lawson, in a letter to the contracting officer described the attempts by the contractor to alleviate the problems on the pipeline project during talks with, Gerald Miller, the contracting officer's representative:

2. We asked clarification of your latest direction concerning the additional pipeline repairs. [Gerald Miller] gave verbal direction that we were to resume work and make all identified epoxy and weld repair and that a request for proposal would come as soon as funds were available.

3. We asked the status of the three previous pending modification and we were told th[a]t they were being processed.

We feel that Jerry Miller[']s answers are "standard Government answers" and we also, feel that the Government does not realize the magnitude of the impact that these answers will have on Ken[t]ucky Bridge & Dam Painting and our subcontractor Jerrico [sic] Painting.

We therefore, request that you consider the following:

We have been given direction to make repairs that far exceed the contract requirements and by doing so we must consider the fact that the cost for down time for our equipment will far exceed the cost of the repairs. You should now see that the monthly billing per the original contract would not even pay the cost for doing . . . the work.

We must therefore advise you that your direction to do the additional work, coupled with your refusal to pay for stored materials and the cost of the down time has placed a burden on Kentucky Bridge &

Dam Painting and Jericho Painting that we may not be able to bear.

If you stand by your decisions we will most likely be forced to abandon the project, while pursuing the matter thru channels up to and including aide from our Senators and Congressmen, as to why the Contracting Officer at Andersen AFB would direct a small Business to finance a project far beyond our capabilities.

We urge you to re-consider the facts and issue a plan that we can comply with as soon as possible.

The contracting officer, John E. Miller, in a letter dated May 8, 1991, informed Kentucky of changes to the contract specifications and the direction the contractor was to take on the project:

1. This letter is to clarify requirements for repairing pits on subject contract. According to the contract specifications, all pits greater than ⅛ inch deep shall be repaired using the fill-weld method or patch-weld method. The upcoming modification will delete the option for fill-welding and require all pits greater than 1/8 inch deep to be repaired using the patch-weld method. This includes those pits over 1/8 inch deep in the original contract specifications (approximately 100 pits). *All* pits less than 1/8 inch deep, however, shall still be repaired using the epoxy fill method.

2. Based on the above information from Base Civil Engineering, you are hereby directed to proceed with the work effort immediately to avoid any further delays. This letter will serve as confirmation of our conversation on 6 May 91 concerning this matter.

In a letter dated May 30, 1991, the contracting officer further modified the contract requirements:

1. I have been advised by the Base Civil Engineer that HQ PACAF has stated that it is not necessary to expoxy [sic] repair pits in the pipeline less than ⅛" in depth. Therefore, you are hereby directed to comply with these instructions.

2. A Government estimate for a change, covering the additional effort is now being prepared by the Project Engineer, and will

be forwarded for your proposal in the very near future.

In a letter dated June 17, 1991, contracting officer Larry M. Whitworth, presented the government's proposed change to the contract and requested a price proposal from Kentucky for these changes to the specifications. Attached to the letter were revisions to the Statement of Work section of the contract specifications:

For "Statement of Work" revise the following:

A. Project AJJY 86–2013, paragraph:

2j. Delete the entire paragraph and substitute the following:

"Patch-welding shall be made on pits deeper than ⅛ inch (using 4″ × 8″ × 5/16″ or larger steel plate from an 8–inch diameter steel pipe) after blasting, pre-treatment, priming, and coating as specified for project. No fill-welding will be allowed for project."

2k. Delete the entire paragraph and substitute the following:

"Filling with epoxy cement on pits less than ⅛-inch deep is applicable only for the completed lengths of pipelines for project (as of 30 May 91). The rest of pipelines with pits less than 1/8-inch deep shall not be applied with epoxy cement but painted as specified for the project."

B. Project AJJY 86–2016, paragraph:

2j. Delete the entire paragraph and substitute the following:

"Patch-welding shall be made on pits deeper than ⅛ inch (using 4″ × 8″ × 5/16″ or larger steel plate from an 8-inch diameter steel pipe) after blasting, pre-treatment, priming, and coating as specified for project. No fill-welding will be allowed for project."

2k. Delete the entire paragraph and substitute the following:

"Filling with epoxy cement on pits less than ⅛-inch deep is applicable only for the completed lengths of pipelines for project (as of 30 May 91). The rest of pipelines with pits less than 1/8-inch deep shall not be applied with epoxy cement but painted as specified for the project."

On June 27, 1991, the contractor submitted a proposal for the completion of the contract, incorporating the revisions and modifications quoted above, that proposed increasing the total contract price to $3,704,420.72.

In August 1991, the contracting officer rejected Kentucky's proposal to complete the work and requested a second modification proposal for the work performed "on the approximately 139,280 pits that were repaired during the period from May to June 1991 and its delay costs incurred during that period." The plaintiff also alleges that while 139,280 pits were prepared, epoxy-filled and painted in May and June of 1991, a total of 525,172 pits were prepared at great cost up to the time the subcontractor left the jobsite on or about September 11, 1991. The contracting officer, in a letter dated September 10, 1991, informed Kentucky that the Air Force was still awaiting Kentucky's revised proposal "for the additional repairs on 139,-280 additional pits." The contracting officer also stated that "Jeff Woodcock from Jericho Painting was informed of this when he called this office on 22 Aug, 26 Aug, 30 Aug and again on 4 Sep 91."

Kentucky's subcontractor, Jericho, stopped work on the pipeline on or about September 12, 1991. At that point, 86.84 percent of the work under the contract had been completed. On or about September 13, 1991, Jericho sent to Kentucky "its proposed modifications to the contract for the work on the approximately 139,280 pits that were prepared during the period from May to June 1991 and its delay costs incurred during that period. The proposal was forwarded to the Government by" Kentucky.

On October 9, 1991, Jericho filed a Miller Act suit, pursuant to 40 U.S.C. § 270a-b, against Kentucky and Fidelity & Deposit Co. of Maryland (Fidelity) in the United States District Court for the Territory of Guam. This suit alleged breach of contract for alleged differing site conditions, fraud, and quantum meruit in the amount of $1,810,-000.00. On February 29, 1992, Jericho amended the complaint in the district court case and added a count for bad faith settlement practices. The counterclaim and answer from Kentucky alleged that the sub-

contractor Jericho was paid all sums owed during the progression of the contract, that the subcontractor had breached the contract by withdrawing from the site on September 12, 1991 prior to completion of the contract, and that Kentucky had fulfilled its contractual obligations to the subcontractor.

On March 9, 1992, the government issued Modification No. 3, pursuant to the Changes clause in the contract, No. F–66, 48 C.F.R. § 52.243–4, to deal with settlement of the contractor's 12-day delay claim. This modification increased the cost of the contract from $1,285,456.18 to $1,465,456.18, an increase of $180,000.00.

On May 14, 1992, the government, terminated the contract for the government's convenience, retroactively effective to March 31, 1992, acknowledged by a signature on behalf of Kentucky on Modification No. 4 to the contract. This termination, as stated on the contract modification, was "pursuant to authority of: CONTRACT CLAUSE # 78 ENTITLED TERMINATION FOR CONVENIENCE OF GOVT." In conjunction with this effort, the government prepared the "Contracting Officer's Statement of Facts For Termination For Convenience Contract F64133–90–C0015 Corrosion Control of Cross Country POL Pipelines–Guam," which stated as follows:

23. On 24 February 92, the Government agreed to a suspension of work to negotiate claims for equitable adjustment for the additional work on the 139,280 pits and delay costs due to the excessive pitting.

24. The Contractor is entitled to an equitable adjustment for the extra work performed at the direction of the Government on the 139,280 pits and for the delay in performing the work due to the differing site condition on the 86.84% of the work already completed.

25. At the present time the Contractor is litigating a $2,500,000 claim by its subcontractor, Jericho Painting and Special Coating, Inc., for extra work and delay damages caused by the differing site conditions. One main issue in that litigation is the determination of the portion of the total amount of extra costs incurred by Jericho attributable to delays caused by Jericho and the portion of those costs attributable to the differing site conditions and, therefore, compensable by the Air Force. FAR 52.2360–2.

26. The Contractor is vigorously defending the case which is set for trial on 14 September 1991. The Contractor intends to defeat all non-compensable costs which are included in the claim of the subcontractor. It is in the best interests of the Government to allow the Contractor to conclude that litigation, prior to determining the quantum of the equitable adjustment due the Contractor.

27. Upon completion of the litigation the Contractor will submit documentation to support its claim for an equitable adjustment for the delay costs due to the differing site conditions, for the cost of extra work performed in repairing the 139,280 pits in May of 1991, and its settlement costs.

28. As evidenced by the above-stated facts and documentation, it is evident that it is in the best interests of the Government to terminate the Contract for convenience to avoid the additional costs of completing the pipeline under the contract, and permit the Contractor to fully litigate the claim of its Subcontractor. Once the Contractor has completed the litigation with its Subcontractor, the Government can more easily and fairly negotiate an equitable adjustment of the Contract with the Contractor.

In August 1992, Kentucky, Jericho, Fidelity, Howell Construction, Inc., Michael Howell, and Jennie Howell, entered into a settlement agreement to settle the disputes between the parties, including, as stated in paragraph II:

All claims now asserted or which could be asserted in the case styled *United States of America for the Use and Benefit of Jericho Painting and Special Coating Company, Inc. v. Kentucky Bridge & Dam, Inc. and Fidelity & Deposit Company of Maryland, Inc.*, Case No. 91–00083 in the United States District Court of Guam—Territory of Guam.

The settlement agreement also addressed the resolution of other outstanding claims and disputes, and identified Jericho as the appropriate litigant in future actions regarding the claims at issue in the agreement:

I. The purpose of this Agreement is to settle all disputes and claims now existing by and between the parties, including claims which might arise in the future based upon the acts or omissions of any party, their agents, employees or assigns which occurred on or before the date of this Agreement entered herein.

The settlement agreement also instructed that:

III. The parties shall jointly move the District Court for Guam for an Order staying all proceedings until such time as all matters involved with the claims, modifications and Termination for Convenience have been resolved, including appeals, and all payments received from the Air Force have been paid into Court and disbursed according to this Agreement. At that time, all of the above referenced actions shall be dismissed with prejudice.

IV. All claims described herein which have not yet been raised in any court proceeding shall be barred.

V. Jericho Painting and Special Coating Company, Inc. shall be designated as the real party in interest and authorized to pursue its claim and the claim of Kentucky Bridge under Contract No. F64133–90–C0015, for the painting of POL pipeline in the Territory of Guam through the Department of the Air Force. To the extent permitted by law, Jericho shall include in the claim and use its best efforts to recover Kentucky Bridge's claim for labor, equipment, materials, overhead, profit, attorneys fees, costs, F & D's [,Fidelity's,] attorneys fees, and F & D's costs.

VI. Kentucky Bridge ... agrees to fully cooperate in the presentation of the claim to the Air Force. Jericho shall agree to keep Kentucky Bridge advised of the progress of the claim and Kentucky Bridge and its attorneys shall be entitled to participate therein, however, Jericho's shall have full discretion as to the disposition of the claim.

\* \* \*

X. All sums recovered by Jericho or Kentucky Bridge from the Air Force shall be paid into the District Court of Guam and shall be considered trust funds to be distributed immediately as received by the Court as follows:

A. The first $135,000 plus $250,000 shall be paid to F & D to reimburse F & D for payment made to Anchor Pattern International under the Payment Bond issued herein and F & D accepts this amount as full payment.

B. The next $165,000 shall be paid to Kentucky Bridge.

C. Next to Kentucky Bridge or to its attorney, Laurence J. Zielke, its costs and attorneys' fees, including any costs and attorneys' fees incurred in assisting Jericho in the prosecution of the claims against the Air Force;

Next to F & D in reimbursement of its costs and attorney's fees less 15% thereof, said 15% to be paid to Jericho; and

All remaining sums to Jericho.

XI. Kentucky Bridge and Jericho shall waive any and all claims against each other known or unknown at the time this Agreement is signed.

Subsequently, the United States District Court for the Territory of Guam, in an Order dated August 26, 1992, granted a stay of the proceedings and required the parties to provide the district court with regular status reports, as follows:

1. This action shall be stayed until the parties move for dismissal pursuant to the Settlement Agreement.

2. The parties have agreed that for the period of the stay, no party will initiate or pursue any litigation, action, or proceeding relating to their breach of contract, fraud or bad faith dispute including the action identified above until after a status conference with the Court and in accordance with any scheduling order the Court may order with the exception that (i) during the period of the stay, the parties may take *de bene esse* depositions to preserve the testimony of any individual who is ill or infirm (each party has the obligation to identify

any individual of whom the parties become aware through the ordinary course of business is ill or infirm and whose depositions the party believes should be taken pursuant to this order); and (ii) the parties agree that the stay does not apply to discovery of documents held by third parties.

3. During the stay of the litigation, the parties have agreed to cooperate in the pursuit of the parties' collective claims against the United States Air Force.

4. The parties have agreed to produce the necessary documents required to pursue their claims against the Air Force.

5. This Order is being entered pursuant to the representation of the parties that they have reached a settlement of this action as to all claims and all parties. In order to effectuate the settlement agreement, however, the parties require an opportunity to pursue the underlying claims which exist against the United States government and therefore seek a stay of the action. A stay of the action is in the best interest of all parties, as well as judicial economy. This settlement agreement will eliminate the need for the Pretrial Conference and the Summary Judgment Motion hearings which are scheduled for September 4, 1992. The settlement and stay will also eliminate the need for the trial which is scheduled for September 8, 1992.

On September 1, 1992, counsel for Kentucky sent a letter to the contracting officer detailing its position on existing disputes. Then on September 17, 1992, the contractor sent a letter, that Kentucky alleges was a claim for breach of contract and cardinal change damages. A certification by the President of Kentucky, Michael Howell was submitted with the letter and qualified as, "[b]ased upon Jericho's certification" which was attached to the letter claim. The letter also requested "a contracting officer's final decision pursuant to the Contract Disputes Act of 1978." On September 30, 1992, Kentucky sent another letter to the contracting officer asking for payment of damages suffered by the contractor. In a letter dated October 16, 1992, the contracting officer, George E. Jackson, advised the contractor that he was responding to the September 1,

1992 and the September 17, 1992 claim letter, and that the contract permitted termination for convenience:

> This letter is to confirm our various conversations and responds to your letters of 1 Sep, 17 Sep, and 30 Sep 92 ... in regards to settlement of outstanding matters relating to Contract No. F64133–90–C0015.

> \* \* \*

> While I regret the delay in settling the outstanding issues under this contract, I must emphasize that the government has been unable to proceed with settlement negotiations without your clients' compliance with the termination for the convenience of the government letter's instructions, regardless of whether the information that would have been contained on the requested forms had been previously submitted in another format. In regards to your assertion that the government was in breach of this contract by virtue of the alleged "cardinal change" to the contract regarding additional work, and thus the termination for convenience of the government clause is inoperative, I direct your attention to FAR 52.243–4, incorporated into the cont[r]act in Sec. F, Page 13, No. F–66. Under this clause the government may direct changes to a contract that are within the original scope of the contract. The test for whether a change is within the scope of the contract is whether the changed work "was essentially the same work as the parties bargained for when the contract was awarded." In this case the changes directed were due to the differing site conditions and were necessary to complete the work originally contemplated by the parties—to paint and refinish the pipeline.

> Regardless, however, of whether the change was within the scope of the contract, or a cardinal change and therefore beyond the scope of the contract, any claim arising from the changed work is assimilated into the termination for the convenience of the government negotiations.

(citations omitted).

On October 28, 1992, the contractor submitted its "Cost Support Data for Modifica-

tion Proposals submitted June 27, 1991, and October 29, 1991 to Repair Additional Pipeline Pits."[5] From the record, it appears that a Defense Contract Audit Agency (DCCA) audit was performed during this time period. The contractor submitted a Total Cost Settlement Proposal for the unresolved and unsettled claims on March 31, 1993, certified by Michael L. Howell, President of Kentucky.

On April 12, 1993, Modification No. 5 to the contract was issued, which states in pertinent part:

a. The purpose of this modification is to increase the funds obligated to Contract Number F16433–90–C0015 to support the partial payment of $795,107 before complete settlement of this terminated contract. This partial payment is authorized by FAR 49.112–1 and it is based upon the claim submitted on behalf of Kentucky Bridge and Dam (the contractor) by Mr[.] Jeffrey Woodcox who is duly authorized by the contractor to certify this application for partial payment on behalf of the contractor.

b. The contractor certifies that its settlement proposal includes only unsettled contract changes and allowable costs incurred in the performance or settlement of this terminated contract. The contractor further certifies that the amount requested is made in good faith, that the supporting data are accurate and complete to the best of the contractor's knowledge and belief, and that the amount requested partially reflects the contract adjustment for which the contractor believes the Government is liable.

c. This partial payment will not prejudice the Government's or contractor's interest in disposing of any unsettled part of the contractor's settlement proposal.

Subsequently, the parties began negotiating a settlement. Kentucky and Jericho submitted their books and records to DCAA and underwent at least one other audit each in connection with their termination for convenience settlement proposals. According to the plaintiff, upon receipt of an interim payment in connection with their claim and authorized by Modification No. 5 to the contract, the parties proceeded to make distribution in accordance with the terms of the Settlement Agreement. The parties are in agreement "that the termination for convenience settlement proposal ripened into a proper CDA claim on October 1, 1993, when the parties reached an impasse in their negotiations."

On December 7, 1993, Kentucky filed the instant action in the United States Court of Federal Claims, as Case No. 93–744C, seeking damages from attempts at performing the contract at issue in this case, entitled "Corrosion Control of Cross Country POL Pipelines," that were to be undertaken from the Navy Air Station to Y–Sengsong Road and from Y–Sengsong Road to Andersen Air Force Base, on the island of Guam. The complaint alleges that Jericho has been designated the "real party in interest" as "it suffered the greatest financial harm for which [Kentucky] could be fully liable as a direct cost" under the contract. Count I of the complaint alleges cardinal change/breach of contract "as a result of the materially misrepresented condition of the pipeline as compared with the actual conditions encountered coupled with the inherently dangerous nature and extent of the work performed." Count II of the complaint seeks "Termination for Convenience Settlement Costs With An Equitable Adjustment For Costs Associated With The Differing Site Condition."

On March 18, 1994, the United States District Court for the Territory of Guam granted Kentucky's motion for summary judgment and denied Jericho's cross-motion for summary judgment in the case pending before the district court. In addition, the United States District Court for the Territory of Guam in its memorandum order dated March 18, 1994, stated that the settlement agreement was "subsequently signed by both parties in May 1993."[6] The court in its memo-

---

5. The plaintiff states that although this claim was dated October 28, 1992, the certification, this time by Jeffrey Woodcox for Kentucky, was not attached until mid-November at a meeting between the contractor and the contracting officer.

6. In the plaintiff's proposed statement of facts, the plaintiff disputes the finding by the district court that the settlement agreement was signed, by stating, "Plaintiff disputes this as a clear error

randum order, at pertinent parts, stated the following:

> In support of its motion, Kentucky points to a settlement agreement reached by the parties to this action in August 1992, which was unsigned but which terms were complied with by both sides and subsequently signed by both parties in May 1993. Kentucky contends that because, in the August 1992 settlement agreement, the parties stipulated to the terms of the settlement of all issues and claims by each party against the others, there remains no legal or factual issue to be tried by the Court. The Court agrees.

\* \* \*

> Jericho contends that the August 1992 Agreement is not dispositive of all issues in controversy between the parties. However, Jericho has failed to direct the Court to any evidence directly supporting this contention. This is directly controverted by the paragraph II of the 1992 Agreement. It is also utterly inconsistent with the representation Jericho made to this Court, when a stay of the instant action was requested in August 1992, that the parties have reached a settlement of this action as to all claims and all parties. This evidence on this point is so one-sided that Kentucky must prevail as a matter of law.

> Jericho next contends that summary judgment must be denied to Kentucky because the parties did not intend, at the time they entered into the 1992 Agreement, that a judgment be entered by the Court dispositively dismissing the action. This contention conflicts with the evidence discussed above. Again, Kentucky must prevail as a matter of law.

> Jericho also argues that summary judgment must be denied to Kentucky because the settlement agreement was intended to provide a mechanism by which the parties could pursue the government claims and upon receipt of such sums, for distribution through the Court. It is undisputed that Jericho has been pursuing the claims against the United States in accordance with the agreement. Moreover, Jericho's

> contention is inconsistent with the terms of the May 1993 Agreement which modified the 1992 Agreement by providing for the distribution of the monies through a joint checking account. Again, Kentucky must prevail as a matter of law.

> Jericho also contends that the 1992 settlement agreement forecloses summary judgment for Kentucky the following reasons: (1) all the parties to the settlement agreement contemplated that the subject action merely be stayed pending performance of all the requirements of the Agreement; (2) there was no mutuality of the parties; and (3) there was no accord and satisfaction among the parties. Again, this Court disagrees. Summary judgment is appropriate when there is no genuine issue of *material* fact. Which facts are material is governed by the relevant substantive law. Here, the parties voluntarily entered into a binding settlement agreement, pursuant to which this Court stayed the proceedings in this action. Jericho has not complained of any circumstances, such a fraud, duress or mistake, that would invalidate the agreement. In fact, the agreement has been admirably enforced and complied with by all parties. This Court finds no material issue precluding the grant of summary judgment to Kentucky.

(citations omitted).

### DISCUSSION

Initially, the defendant filed a motion to dismiss, or in the alternative, a motion for summary judgment, that addressed both of the counts in the plaintiff's complaint. Subsequent to the filing of responsive papers by the parties, the United States Court of Appeals for the Federal Circuit decided two cases, *Reflectone, Inc. v. John H. Dalton, Secretary of Navy,* 60 F.3d 1572 (Fed.Cir. 1995) and *James M. Ellett Constr. Co., Inc. v. United States,* 93 F.3d 1537 (Fed.Cir.1996), that implicated the instant litigation and the parties were requested to brief these cases and their application to the instant case. Therefore, in papers filed with the court on

of fact. Indeed to the extent material hereto, the

Agreement was never signed."

January 6, 1997 and at an in court status conference with all parties present on January 27, 1997, the defendant withdrew its motion to dismiss on Count II of the complaint.

Count I of the complaint alleges cardinal change and breach of contract claims "as a result of the materially misrepresented condition of the pipeline as compared with the actual conditions encountered coupled with the inherently dangerous nature and extent of the work performed." In the papers filed with the court on January 6, 1997, the defendant maintains that its motion to dismiss on jurisdictional grounds for Count I remains viable, arguing that because the plaintiff's alleged claim letter, dated September 17, 1992, never demanded the payment of money as a matter of right, the letter is not a proper claim under the Contract Disputes Act, 41 U.S.C. §§ 601–613 (1994) (CDA), and that it has not been converted into a proper CDA claim.

Count II of the complaint seeks costs based upon an alleged equitable adjustment claim and a termination for convenience settlement proposal submitted by plaintiff to the contracting officer under the contract. The defendant, initially argued that the termination settlement proposal was not a proper CDA claim when submitted to the contracting officer on March 31, 1993. However, in the papers filed with the court on January 6, 1997, the defendant conceded that the termination for convenience settlement proposal ripened into a proper CDA claim on October 1, 1993 when the parties reached an impasse in their negotiations.

As stated above, the defendant conceded that the court has jurisdiction to entertain Count II of plaintiff's complaint. Therefore, once the court decides whether it has jurisdiction to entertain Count I of plaintiff's complaint, it must then rule upon the defendant's motion for summary judgment on both counts. The defendant argues that plaintiff's claims, to the extent they seek compensation on behalf of Jericho, are barred by both judicial and collateral estoppel, as the issues

raised by plaintiff's complaint were litigated and decided during the Miller Act suit in the United States District Court for the Territory of Guam. The defendant also argues that the plaintiff's claims are precluded by the *Severin* Doctrine.

## I. Motion to Dismiss

The court first considers defendant's motion to dismiss, pursuant to RCFC 12(b)(1), for lack of subject matter jurisdiction regarding plaintiff's claim alleged in Count I for an alleged breach of contract/cardinal change under the CDA. When considering a motion to dismiss, the court may consider all relevant evidence in order to resolve any disputes as to the truth of the jurisdictional facts alleged in the complaint. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed.Cir.1988). The court is required to decide any disputed facts which are relevant to the issue of jurisdiction. *Id.*

The standard for weighing the evidence presented by the parties when evaluating a motion to dismiss for lack of jurisdiction, pursuant to RCFC 12(b)(1),[7] has been articulated by the United States Supreme Court, as follows: "in passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *accord Hamlet v. United States*, 873 F.2d 1414, 1416 (Fed.Cir.1989); *see also Alaska v. United States*, 32 Fed.Cl. 689, 695 (1995), *appeal dismissed*, 86 F.3d 1178 (Fed.Cir. 1996). In rendering a decision, the court must presume that the undisputed factual allegations included in the complaint by a plaintiff are true. *Miree v. DeKalb County*, 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d at 746; *Alaska v. United States*, 32 Fed.Cl. at 695.

7. In general, the rules of this court are patterned on the Federal Rules of Civil Procedure. Therefore, precedent under the Federal Rules of Civil Procedure is relevant to interpreting the rules of this court, including RCFC 12(b)(1) and RCFC

56, discussed below. *See Jay v. Secretary DHHS*, 998 F.2d 979, 982 (Fed.Cir.1993); *Imperial Van Lines Int'l, Inc. v. United States*, 821 F.2d 634, 637 (Fed.Cir.1987); *Lichtefeld–Massaro, Inc. v. United States*, 17 Cl.Ct. 67, 70 (1989).

The burden of establishing jurisdiction is on the plaintiff. *McNutt v. General Motors Acceptance Corp. of Indiana*, 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); *Alaska v. United States*, 32 Fed.Cl. at 695; *Catellus Dev. Corp. v. United States*, 31 Fed. Cl. 399, 404 (1994). The court should not grant a motion to dismiss "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (footnote omitted). Nonetheless, "conclusory allegations unsupported by any factual assertions will not withstand a motion to dismiss." *Briscoe v. LaHue*, 663 F.2d 713, 723 (7th Cir.1981), *aff'd*, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983).

In order for this court to have jurisdiction over the plaintiff's complaint, the Tucker Act, 28 U.S.C. § 1491 (1994), as amended, 28 U.S.C.A. § 1491 (West Supp.1998), requires that a substantive right, which is enforceable against the United States for money damages, must exist independent of 28 U.S.C. § 1491. The Tucker Act provides:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1). The Tucker Act merely confers jurisdiction on the United States Court of Federal Claims; it does not create a substantive right that is enforceable against the United States for money damages. *United States v. Mitchell*, 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607, *reh'g denied*, 446 U.S. 992, 100 S.Ct. 2979, 64 L.Ed.2d 849 (1980); *United States v. Testan*, 424 U.S. 392, 398–99, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976); *United States v. Connolly*, 716 F.2d 882, 885 (Fed.Cir.1983) (*en banc*), *cert. denied*, 465 U.S. 1065, 104 S.Ct. 1414, 79 L.Ed.2d 740 (1984).

Moreover, a waiver of the traditional sovereign immunity "cannot be implied but must be unequivocally expressed." *United States v. King*, 395 U.S. 1, 4, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969) (citing *United States v. Sherwood*, 312 U.S. 584, 61 S.Ct. 767, 85 L.Ed. 1058 (1941)). The individual claimants, therefore, must look beyond the jurisdictional statute for a waiver of sovereign immunity. *United States v. Testan*, 424 U.S. at 398, 96 S.Ct. 948. "[I]n order for a claim against the United States founded on statute or regulation to be successful, the provisions relied upon must contain language which could fairly be interpreted as mandating recovery of compensation from the government." *Cummings v. United States*, 17 Cl.Ct. 475, 479 (1989), *aff'd*, 904 F.2d 45 (Fed.Cir.1990) (citations omitted); *see also United States v. Mitchell*, 463 U.S. 206, 216–17, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) (citing *United States v. Testan*, 424 U.S. at 400, 96 S.Ct. 948 (quoting *Eastport S. S. Corp. v. United States*, 178 Ct.Cl. 599, 607, 372 F.2d 1002, 1009 (1967))); *Duncan v. United States*, 229 Ct.Cl. 120, 138, 667 F.2d 36, 47 (1981), *cert. denied*, 463 U.S. 1228, 103 S.Ct. 3569, 77 L.Ed.2d 1410 (1983).

The defendant argues that the alleged cardinal change/breach of contract claim, set forth in Kentucky's September 17, 1992 letter to the contracting officer, is not a proper CDA claim because the letter does not qualify as a written demand seeking, as a matter of right, the payment of money in a sum certain. Specifically, the defendant contends that the September 17, 1992 letter was an alternative settlement proposal for the contracting officer's consideration intended to invite further discussions. The defendant suggests that if the letter is considered as a claim, then it was withdrawn in the September 30, 1992 letter, by the plaintiff's statements that the September 17, 1992 letter was " 'uncertified' " and that the earlier letter was "another alternative to resolving this matter."

In addition, the defendant suggests that since the September 17, 1992 letter was merely a settlement proposal that it never ripened into a claim as there were no related negotiations and thus no subsequent impasse in negotiations. The defendant presents as support the argument that "the parties never

engaged in negotiations over the costs set forth in the letter [of September 17, 1992] because the Government did not consider the submission to be responsive to its requirement that a termination for convenience settlement proposal be submitted." The defendant, moreover, argues that Kentucky "could not submit a CDA 'claim' without first submitting the required final termination settlement proposal and then attempting to reach agreement with the contracting officer concerning the amount due."

The CDA requires that "[a]ll claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the contracting officer for a decision." 41 U.S.C. § 605(a). Under the CDA, jurisdiction over a claim vests in this court upon the following statutory provisions:

(1) ... For claims of more than $100,000, the contractor shall certify that the claim is made in good faith, that the supporting data are accurate and complete to the best of his knowledge and belief, that the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable, and that the certifier is duly authorized to certify the claim on behalf of the contractor.

(2) A contracting officer shall, within sixty days of receipt of a submitted certified claim over $100,000—

(A) issue a decision; or

(B) notify the contractor of the time within which a decision will be issued.

(3) The decision of a contracting officer on submitted claims shall be issued within a reasonable time, in accordance with regulations promulgated by the agency, taking into account such factors as the size and complexity of the claim and the adequacy of the information in support of the claim provided by the contractor.

\* \* \*

(5) Any failure by the contracting officer to issue a decision on a contract claim within the period required will be deemed to be a decision by the contracting officer denying the claim and will authorize the commencement of the appeal or suit on the claim as otherwise provided in this chapter. However, in the event an appeal or suit is so commenced in the absence of a prior decision by the contracting officer, the tribunal concerned may, at its option, stay the proceedings to obtain a decision on the claim by the contracting officer.

(6) The contracting officer shall have no obligation to render a final decision on any claim of more than $100,000 that is not certified in accordance with paragraph (1) if, within 60 days after receipt of the claim, the contracting officer notifies the contractor in writing of the reasons why any attempted certification was found to be defective. A defect in the certification of a claim shall not deprive a court or an agency board of contract appeals of jurisdiction over that claim.

41 U.S.C. § 605(c); *see James M. Ellett Constr. Co. v. United States*, 93 F.3d 1537, 1541–42 (Fed.Cir.1996) (citing *Reflectone, Inc. v. Dalton*, 60 F.3d 1572, 1575 (Fed.Cir. 1995) (en banc)). The Contract Disputes Act, however, leaves the term "valid claim" undefined. *See James M. Ellett Constr. Co. v. United States*, 93 F.3d at 1541–42.

The United States Court of Appeals for the Federal Circuit, in *James M. Ellett Constr. Co., Inc. v. United States*, defined the parameters of a claim, while distinguishing between routine and nonroutine claims:

Under the FAR, there are three requirements a nonroutine submission must meet to be a "claim." It must be: (1) a written demand or assertion, (2) seeking as a matter of right, (3) the payment of money in a sum certain. 48 C.F.R. § 33.201 (1995); *Reflectone*, 60 F.3d at 1575.... A routine request for payment, on the other hand, must also be "in dispute" when submitted to meet the definition of a "claim." 48 C.F.R. § 33.201; *Reflectone*, 60 F.3d at 1576.

Our threshold inquiry, therefore, is whether [the contractor's] termination settlement proposal was a routine submission. *See Reflectone*, 60 F.3d at 1577 ("[T]he critical distinction in identifying a 'claim' is ... between routine and non-routine submissions."). In that regard, a "demand for compensation for unforeseen or unintended

circumstances cannot be characterized as 'routine.'" *Id.* (request for an equitable adjustment is "anything but a 'routine request for payment'"). On the other hand, vouchers, invoices, and similar requests for payment are "submitted for work done or equipment delivered by the contractor in accordance with the expected or scheduled progression of contract performance." *Id.*

Using these beacons as guides, it is difficult to conceive of a less routine demand for payment than one which is submitted when the government terminates a contract for its convenience. Such a demand, which occurs only in a fraction of government contracts is certainly less routine than a request for an equitable adjustment, several of which a contractor might submit on any one contract. Indeed, in concluding that a request for an equitable adjustment is not routine in *Reflectone*, we pointed to Supreme Court precedent equating a request for an equitable adjustment with an assertion of a breach of contract. That analogue is even more appropriate here, where, but for the convenience termination clause, the government's action would be a breach of contract, and it would be liable for resulting damages. *See G.L. Christian and Assocs. v. United States*, 160 Ct.Cl. 1, 312 F.2d 418, 423 (1963). A request for payment submitted after the government has terminated the contract during its performance is a far cry from a request submitted in accordance with the expected or scheduled progression of contract performance.

*James M. Ellett Constr. Co. v. United States*, 93 F.3d at 1542–43; *see Reflectone, Inc. v. Dalton*, 60 F.3d at 1577.

The United States Court of Appeals for the Federal Circuit, in *Reflectone, Inc. v. Dalton*, 60 F.3d 1572, likewise had examined the definition of routine and nonroutine claims in the context of requests for equitable adjustment (REA) in government contracts:

the critical distinction in identifying a "claim" is not between undisputed and disputed submissions, but between routine and non-routine submissions.

To read the dispute requirement of sentence [2] of FAR 33.201 as applying to all submissions for payment, as the government suggests, one would have to construe *every* demand for payment as a matter of right as a "routine request for payment." However, this is clearly not so. For instance, an REA is anything but a "routine request for payment." It is a remedy payable only when unforeseen or unintended circumstances, such as government modification of the contract, differing site conditions, defective or late-delivered government property or issuance of a stop work order, cause an increase in contract performance costs. *Pacific Architects and Eng'rs Inc. v. United States*, 491 F.2d 734, 739, 203 Ct.Cl. 499 (1974). A demand for compensation for unforeseen or unintended circumstances cannot be characterized as "routine." The Supreme Court has confirmed the non-routine nature of an REA by equating it with assertion of a breach of contract. *Crown Coat Front Co. v. United States*, 386 U.S. 503, 511, 87 S.Ct. 1177, 1181, 18 L.Ed.2d 256 (1967) ("With respect to claims arising under the typical government contract, the contractor has agreed in effect to convert what otherwise might be claims for breach of contract into claims for equitable adjustment."). Thus, an REA provides an example of a written demand for payment as a matter of right which is not "a routine request for payment" and, therefore, it satisfies the FAR definition of "claim" whether or not the government's liability for or the amount of the REA was already disputed before submission of the REA to the CO.[8]

---

**8.** In footnote seven in the *Reflectone* opinion, the court stated, in dicta, that not all nonroutine submissions are claims:

We do not hold, however, that every nonroutine submission constitutes a "claim" under the FAR. Those submissions which do not seek payment as a matter of right are not claims, a definition which excludes, for example, cost proposals for work the government later decides it would like performed. *See Essex Electro Eng'rs*, 960 F.2d at 1581–82 (excluding cost proposals and inspection reports from the FAR definition of a CDA "claim").

60 F.3d at 1577 n.7.

A routine request for payment, on the other hand, is made under the contract, not outside it. For example, a voucher or invoice is submitted for work done or equipment delivered by the contractor in accordance with the expected or scheduled progression of contract performance. Similarly, progress payments are made by the government when the contractor completes predetermined stages of the contract. An REA can hardly be compared to an invoice, voucher or progress payment. 60 F.3d at 1577.

■■■ The CDA also requires that the contractor "must submit in writing 'a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim.'" *H.L. Smith, Inc. v. Dalton,* 49 F.3d 1563, 1565 (Fed.Cir. 1995) (citing *Contract Cleaning Maintenance, Inc. v. United States,* 811 F.2d 586, 592 (Fed.Cir.1987)); *Sam Gray Enters. v. United States,* 32 Fed.Cl. 526, 529 (1995); *Pevar Co. v. United States,* 32 Fed.Cl. 822, 824 (1995). "To satisfy the CDA, a claim need not contain any particular language or conform to any specific format." *Pevar Co. v. United States,* 32 Fed.Cl. at 824. Moreover, "[w]hen appropriate, a series of letters can be read together to comprise a clear and unequivocal statement giving the contracting officer notice of the basis for the contractor's claim." *Executive Court Reporters, Inc. v. United States,* 29 Fed.Cl. 769, 774 (1993) (footnote omitted) (citing *Alliance Oil & Refining Co. v. United States,* 13 Cl.Ct. 496, 499 (1987), *aff'd,* 856 F.2d 201 (Fed.Cir.1988)), appeal dismissed by 22 F.3d 1106 (Fed.Cir. 1994). "[T]he contractor need not include a detailed breakdown of costs. The contractor may supply adequate notice of the basis and amount of the claim without accounting for each cost component." *H.L. Smith, Inc. v. Dalton,* 49 F.3d at 1565.

■■■ In the instant action, Kentucky's September 17, 1992 letter, asserting a cardinal change and a breach of contract by the government, is clearly "a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain." 48 C.F.R. § 33.201; *see Reflectone, Inc. v. Dal-* *ton,* 60 F.3d at 1575. In the September 17, 1992 cardinal change/breach of contract letter, Kentucky submitted a written document to the contracting officer demanding the payment of $9,150,596.00, which asserted that the government owed this amount because "[t]he differing site condition encountered is not only a material deviation from that which was represented in the specifications but was so severe in magnitude, scope and nature so as to totally negate pre-bid considerations of the contractor." The plain language of the letter asserts that the submission was certified and requests a contracting officer's final decision pursuant to the CDA.

The defendant's arguments that the September 17, 1992 letter was merely a settlement proposal, that it was later possibly "uncertified," or that it was an inappropriate response to a termination for convenience by the government, does not overcome the language included in the letter which meets the legal requirements of a valid claim. Consequently, the court finds that on the basis of the plaintiff's allegations, Kentucky's September 17, 1992 letter satisfies the requirements for a CDA "claim" in accord with the decisions of the United States Court of Appeals for the Federal Circuit. *See James M. Ellett Constr. Co., Inc. v. United States,* 93 F.3d at 1542–43; *Reflectone, Inc. v. John H. Dalton, Secretary of the Navy,* 60 F.3d at 1574–77. The September 17, 1992 breach of contract/cardinal change letter was not a "routine request for payment" and, therefore, there is no need for a pre-existing dispute as to either liability or amount. *See James M. Ellett Constr. Co., Inc. v. United States,* 93 F.3d at 1542–43; *Reflectone, Inc. v. John H. Dalton, Secretary of the Navy,* 60 F.3d at 1577. The court, therefore, hereby, **DENIES** the defendant's motion to dismiss Count I of the plaintiff's complaint.

## II. Motion for Summary Judgment

In the alternative, the defendant in the above-captioned case has filed a motion for summary judgment on both counts of the complaint. Summary judgment in this court should be granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a

matter of law. RCFC 56 is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed.R.Civ.P.) and is similar both in language and effect. Both rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

RCFC 56(c) provides that in order for a motion for summary judgment to be granted, the moving party bears the burden of demonstrating that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Creppel v. United States,* 41 F.3d 627, 630–31 (Fed.Cir.1994); *Meyers v. Asics Corp.,* 974 F.2d 1304, 1306 (Fed.Cir.1992); *Lima Surgical Assocs., Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States,* 20 Cl.Ct. 674, 679 (1990), *aff'd,* 944 F.2d 885 (Fed.Cir.1991); *Rust Communications Group, Inc. v. United States,* 20 Cl.Ct. 392, 394 (1990). Disputes over facts which are not outcome determinative under the governing law will not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury [trier of fact] could return a verdict for the nonmoving party." *Id.; see also Uniq Computer Corp. v. United States,* 20 Cl.Ct. 222, 228–29 (1990).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 249, 106 S.Ct. 2505; *see, e.g., Cloutier v. United States,* 19 Cl.Ct. 326, 328 (1990), *aff'd,* 937 F.2d 622 (Fed.Cir.1991). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party

must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 250–52, 106 S.Ct. 2505. When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). If the nonmoving party cannot present evidence to support its case under any scenario, there is no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings.

If, however, the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *Id.; see also Litton Indus. Prods., Inc. v. Solid State Sys. Corp.,* 755 F.2d 158, 163 (Fed.Cir.1985); *H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied,* 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

The initial burden on the party moving for summary judgment, to produce evidence showing the absence of a genuine issue of material fact, may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Lima Surgical Assocs., Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States,* 20 Cl.Ct. at 679. If the moving party makes such a showing, the burden then shifts to the nonmoving party to demonstrate that a genuine factual dispute exists by presenting evidence which establishes the existence of an element of its case upon which it bears the burden of proof. *Celotex Corp. v. Catrett,* 477 U.S. at 322, 106 S.Ct. 2548; *Lima Surgical Assocs., Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States,* 20 Cl.Ct. at 679.

Pursuant to RCFC 56, a motion for summary judgment may succeed whether or not accompanied by affidavits and/or other documentary evidence in addition to the pleadings

already on file. *Celotex Corp. v. Catrett*, 477 U.S. at 324, 106 S.Ct. 2548. Generally, however, in order to prevail by demonstrating that a genuine issue for trial exists, the non-moving party will need to go beyond the pleadings by use of evidence such as affidavits, depositions, answers to interrogatories and admissions. *Id.*

Pursuant to a court order, occasioned by the lengthy and confusing pre-existing history of this case, the parties ultimately were able to file joint stipulation of facts along with supporting documents. The defendant, moreover, states that no genuine issue as to any material fact exists in the instant phase of the litigation and that summary judgment is appropriate. The defendant argues that "[u]nder the principle of judicial estoppel, KB & D [Kentucky] is precluded in this case from changing positions, that it adopted, and prevailed upon" in the related Miller Act suit in the United States District Court for the Territory of Guam. The defendant points to Kentucky's answer and counterclaims in the Miller Act suit that argue Kentucky fully compensated Jericho, "that Jericho breached the contract," and that Kentucky had "fulfilled all of its contractual obligations to Jericho under the contract up to the time Jericho breached the contract by stopping work."

The defendant also argues that when the United States District Court for the Territory of Guam granted Kentucky's motion for summary judgment and denied Jericho's cross-motion for summary judgment, premised upon the parties settlement agreement, the District Court was upholding Kentucky's position and that Kentucky prevailed as a matter of law. Ultimately the defendant contends that "[b]ecause the district court in that action denied Jericho's request for damages for breach of contract as a matter of law by granting KB & D's [Kentucky's] motion for summary judgment, KB & D [Kentucky] is judicially estopped from arguing now that Jericho is entitled to damages for breach of contract."

In addition, the defendant contends that the doctrine of collateral estoppel, also known as issue preclusion, serves to bar Jericho, the party which allegedly lost in the district court from seeking costs for the con-

tract work on the pipeline, and, thus, in the instant case, precludes the plaintiff acting on behalf of Jericho from seeking damages for work performed under the contract. In other words, the defendant argues that Jericho, as the real party in interest, may not relitigate issues that were disposed of in the Miller Act suit before the United States District Court for the Territory of Guam.

Finally, the defendant argues that "the pass-through claim" presented by Kentucky on behalf of Jericho is precluded under the doctrine articulated in *Severin v. United States*, 99 Ct.Cl. 435, 1943 WL 4198 (1943), *cert. denied*, 322 U.S. 733, 64 S.Ct. 1045, 88 L.Ed. 1567 (1944). The defendant suggests that both the judgment in the Miller Act suit and the settlement agreement between Kentucky and Jericho, absolve the prime contractor from present and future liability for damages to the subcontractor. The defendant argues that Jericho released Kentucky from liability caused by the actions of the government, and, therefore, a subsequent suit by the contractor on behalf of the subcontractor is not viable pursuant to the *Severin* Doctrine.

**A. Judicial Estoppel**

The United States Court of Appeals for the Federal Circuit, in *Data General Corp. v. Johnson*, 78 F.3d 1556 (1996), discussed the doctrine of judicial estoppel:

The doctrine of judicial estoppel is that where a party successfully urges a particular position in a legal proceeding, it is estopped from taking a contrary position in a subsequent proceeding where its interests have changed. *Davis v. Wakelee*, 156 U.S. 680, 689, 15 S.Ct. 555, 558, 39 L.Ed. 578 (1895); *Wang Labs., Inc. v. Applied Computer Sciences, Inc.*, 958 F.2d 355, 358 (Fed.Cir.1992). Judicial estoppel is designed to prevent the perversion of the judicial process and, as such, is intended to protect the courts rather than the litigants. *See, e.g., Wang Labs., Inc.*, 958 F.2d at 359; *In re Cassidy*, 892 F.2d 637, 641 (7th Cir.), *cert. denied*, 498 U.S. 812, 111 S.Ct. 48, 112 L.Ed.2d 24 (1990); *see generally U.S. Philips Corp. v. Sears Roebuck & Co.*, 55 F.3d 592, 596–97 (Fed.Cir.) *cert. denied*,

[516] U.S. [1010], 116 S.Ct. 567, 133 L.Ed.2d 492 (1995).

The decision whether to invoke judicial estoppel lies within the court's discretion, and a refusal to apply the doctrine is reviewed under the "abuse of discretion" standard. *See, e.g., United States v. Garcia*, 37 F.3d 1359, 1366-67 (9th Cir.1994), *cert. denied*, [514] U.S. [1067], 115 S.Ct. 1699, 131 L.Ed.2d 562 (1995); *Yanez v. United States*, 989 F.2d 323, 326 (9th Cir. 1993); *In re Cassidy*, 892 F.2d at 642; *Scott v. Land Span Motor, Inc.*, 781 F.Supp. 1115, 1119 (D.S.C.1991).

78 F.3d at 1565.[9]

■ The United States Court of Appeals for the Federal Circuit, has cited with approval a number of cases which discuss the implication of a settlement in a previous litigation and the subsequent refusal to apply the doctrine of judicial estoppel. *Water Technologies Corp. v. Calco, Ltd.*, 850 F.2d 660, 665-66 (Fed.Cir.1988) (citing and quoting *Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595, 599 (6th Cir.1982) ("If the initial proceeding results in settlement, the position cannot be viewed as having been successfully asserted" and estoppel is inapplicable); *Konstantinidis v. Chen*, 626 F.2d 933, 939 (D.C.Cir.1980) ("A settlement neither requires nor implies any judicial endorsement of either party's claims or theories, and thus a settlement does not provide the prior success necessary for judicial estoppel.")). "Judicial estoppel is an equitable principle that holds a party to a position on which it prevailed, as against later litigation arising from the same events." *U.S. Philips Corp. v. Sears Roebuck & Co.*, 55 F.3d 592, 596 (Fed. Cir.) (citing *Eagle Foundation, Inc. v. Dole*, 813 F.2d 798, 810 (7th Cir.1987)), *cert. denied*, 516 U.S. 1010, 116 S.Ct. 567, 133 L.Ed.2d 492 (1995).

The instant action presents an unusual set of facts for invocation of the judicial estoppel doctrine as the defendant requests. The settlement agreement discussed may or may not have been signed, but appears to be operative, as is evident by the fact that Kentucky and Jericho are pursuing the above-captioned case in the name of Kentucky, that monies have been distributed in accord with the settlement agreement and because Kentucky and Jericho personnel have provided documents and affidavits in support of the instant action. Moreover, the decision of the United States District Court for the Territory of Guam found that the apparent settlement of the dispute between the parties rendered moot any questions of material fact and the need for further litigation in the district court and, therefore, the district court did not address the issues of liability.

In this action, the delegated party in interest, Jericho, through Kentucky, is attempting to pursue recourse with a litigation posture that is identical to the one adopted in the Miller Act suit. The fact that the principles of government contract law demand that a prime contractor, and not a subcontractor, file a suit against the United States does not invalidate the equity basis for the doctrine of judicial estoppel. Moreover, the court finds it problematic to allow the government to avoid litigating when the contracting officer specifically suggested, in his Statement of Facts for Termination For Convenience, as follows:

25. At the present time the Contractor is litigating a $2,500,000 claim by its subcontractor, Jericho Painting and Special Coating, Inc., for extra work and delay damages caused by the differing site conditions. One main issue in that litigation is the determination of the portion of the total amount of extra costs incurred by Jericho attributable to delays caused by

---

9. The United States Court of Appeals for the Ninth Circuit, in *United States v. Garcia*, 37 F.3d 1359, (9th Cir.1994), *cert. denied*, 514 U.S. 1067, 115 S.Ct. 1699, 131 L.Ed.2d 562 (1995), discussed the "two views of judicial estoppel" that are enforced in the courts:

Under the majority view, judicial estoppel does not apply unless the assertion inconsistent with the claim made in the subsequent litigation "was adopted in some manner by the court in

the prior litigation." Under the minority view, judicial estoppel can apply even when a party was unsuccessful in asserting its position in the prior judicial proceeding, "if the court determines that the alleged offending party engaged in 'fast and loose' behavior which undermined the integrity of the court."

*Id.* at 1367 (citing *Britton v. Co-op Banking Group*, 4 F.3d 742, 744 (9th Cir.1993) (quoting *In re Corey*, 892 F.2d 829, 836 (9th Cir.1989))).

Jericho and the portion of those costs attributable *to the differing site conditions* and, therefore, compensable by the Air Force. FAR 52.2360–2.

26. The Contractor is vigorously defending the case which is set for trial on 14 September 1991. The Contractor intends to defeat all non-compensable costs which are included in the claim of the subcontractor. *It is in the best interests of the* Government to allow the Contractor to conclude that litigation, prior to determining the quantum of the equitable adjustment due the Contractor.

27. Upon completion of the litigation the Contractor will submit documentation to support its claim for an equitable adjustment for the delay costs due to the differing site conditions, for the cost of extra work performed in repairing the 139,280 pits in May of 1991, and its settlement costs.

28. As evidenced by the above-stated facts and documentation, it is evident that it is in the best interests of the Government to terminate the Contract for convenience to avoid the additional costs of completing the pipeline under the contract, and permit the Contractor to fully litigate the claim of its Subcontractor. Once the Contractor has completed the litigation with its Subcontractor, the Government can more easily and fairly negotiate an *equitable adjustment of the Contract with* the Contractor.

As is evident in the contracting officers's findings quoted above, the government appears to have presumed some future negotiations or litigation, if not some form of liability on the part of the government to the plaintiff, perhaps to resolve outstanding amounts owed. Therefore, the court finds it appropriate to allow plaintiff's claims to survive at present. Moreover, judicial estoppel "is intended to protect the courts rather than the litigants." *Data General Corp. v. Johnson,* 78 F.3d at 1565. In sum, the court rejects the defendant's motion for summary judgment premised upon the doctrine of judicial estoppel.

## B. Issue Preclusion

The related doctrines of collateral estoppel (issue preclusion) and *res judicata* (claim preclusion) were summarized by the United States Supreme Court as follows:

A fundamental precept of common-law adjudication, embodied in the related doctrines of collateral estoppel and *res judicata,* is that a "right, question or fact distinctly put in issue and directly determined by a court of competent jurisdiction ... cannot be disputed in a subsequent suit between the same parties or their privies ...." *Southern Pacific R. Co. v. United States,* 168 U.S. 1, 48–49, 18 S.Ct. 18, 42 L.Ed. 355 (1897). Under *res judicata,* a final judgment on the merits bars further claims by parties or their privies based on *the same cause of action. Cromwell v. County of Sac,* 94 U.S. 351, 352, 24 L.Ed. 195 (1876); *Lawlor v. National Screen Service Corp.,* 349 U.S. 322, 326, 75 S.Ct. 865, 99 L.Ed. 1122 (1955); 1B J. Moore, Federal Practice ¶ 0.405[1], pp. 621–624 (2d ed.1974) (hereinafter 1B Moore); Restatement (Second) of Judgments § 47 (Tent. Draft No. 1, Mar. 28, 1973) (merger); *id.,* § 48(bar). Under collateral estoppel, once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a *different* cause of action involving a party to the prior litigation. *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979); Scott, Collateral Estoppel by Judgment, 56 Harv. L.Rev. 1, 2–3 (1942); Restatement (Second) of Judgments § 68 (Tent. Draft No. 4, Apr. 15, 1977) (issue preclusion). Application of both doctrines is central to the purpose for which civil courts have been established, the conclusive resolution of disputes within their jurisdictions. *Southern Pacific R. Co., supra,* at 49, 18 S.Ct. 18; *Hart Steel Co. v. Railroad Supply Co.,* 244 U.S. 294, 299, 37 S.Ct. 506, 61 L.Ed. 1148 (1917). To preclude parties from contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial

action by minimizing the possibility of inconsistent decisions.

*Montana v. United States,* 440 U.S. 147, 153–54, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979) (footnote omitted).

■ The doctrines of *res judicata* and collateral estoppel operate to prevent the relitigation of a claim or issue that has already had its day in court. *Mark Smith Constr. Co. v. United States,* 15 Cl.Ct. 32, 35–36 (1988). By affording a claimant only one opportunity to obtain redress, the doctrines conserve judicial resources, foster reliance upon judicial decisions, and protect litigants from vexatious and needless litigation. *Id.* at 36; *Martin v. United States,* 30 Fed.Cl. 542, 546, *aff'd,* 41 F.3d 1519 (Fed.Cir.1994); *Lins v. United States,* 4 Cl.Ct. 772, 777, *aff'd,* 758 F.2d 666 (Fed.Cir.1984).

■ In *Mother's Restaurant Inc. v. Mama's Pizza,* 723 F.2d 1566 (1983), the United States Court of Appeals for the Federal Circuit articulated the four factors to determine collateral estoppel or issue preclusion:

(1) the issues to be concluded are identical to those involved in the prior action; (2) in that action the issues were raised and "actually litigated"; (3) the determination of those issues in the prior action was necessary and essential to the resulting judgment; and (4) the party precluded ... was fully represented in the prior action.

*Id.* at 1569–70 (citations omitted) (footnote omitted).

■ At the center of the argument presented by the defendant is that the United States District Court for the Territory of Guam made a decision as to entitlement, and that Kentucky had prevailed over Jericho. The district court in Guam, however, premised its decision upon the settlement agreement. As stated by the district court: "Kentucky contends that because in the August 1992 settlement agreement, the parties stipulated to the terms of the settlement of all issues and claims by each party against the others, there remains no legal or factual issue to be tried by the Court. The court agrees." Moreover, the Guam district court emphasized that the need to litigate Jericho's

claims of entitlement no longer existed in the district court in light of the settlement agreement, and the apparent activities to resolve the dispute that were being undertaken pursuant to the settlement agreement.

The mere fact that the district court suggested that there are no issues of fact or law to be resolved, in essence that a need for a suit in the district court is moot because the parties have entered into a settlement agreement, cannot be construed to suggest that Kentucky prevailed over Jericho on the issues of liability in that suit. In addition, there is no evidence before this court that the issue of liability was fully or "actually litigated" and resolved in the Miller Act suit. In sum, it is evident from the words of the United States District Court for the Territory of Guam decision, that the court did not speculate as to the prevailing party on the issue of liability in the Miller Act suit, but rather dismissed the case because it believed that there were no issues in controversy in light of the settlement agreement between these parties.

The court in the instant action, therefore, holds that defendant's motion for summary judgment premised upon collateral estoppel or issue preclusion should be denied.

### 3. *Severin* Doctrine

■ Lacking privity of contract with the government, a subcontractor may not directly sue the United States. *United States v. Johnson Controls, Inc.,* 713 F.2d 1541, 1550–52 (Fed.Cir.1983); *see also Erickson Air Crane Co. v. United States,* 731 F.2d 810, 813 (Fed.Cir.1984). Therefore, a subcontractor without an independent basis for establishing privity with the government can seek redress only through the prime contractor. *See Erickson Air Crane Co. v. United States,* 731 F.2d at 813–814. A prime contractor, on the other hand, has no basis for sponsoring such a suit unless it has paid the subcontractor, or remains liable to reimburse it in the future. *United States v. Johnson Controls, Inc.,* 713 F.2d at 1552 n. 8. The prime contractor's suit, thus, is based on its liability to the subcontractor for the government's damages to the parties. *Severin v. United States,* 99 Ct.Cl. 435, 443 (1943), *cert.*

*denied,* 322 U.S. 733, 64 S.Ct. 1045, 88 L.Ed. 1567 (1944); *see Erickson Air Crane Co. v. United States,* 731 F.2d at 813; *J.L. Simmons Co. v. United States,* 158 Ct.Cl. 393, 397, 304 F.2d 886, 888 (1962)

In *J.L. Simmons Co. v. United States,* our predecessor court, the United States Court of Claims, discussed the application of the *Severin* Doctrine when a release of some form exists between the contractor and the subcontractor:

> The decided cases make abundantly clear that a suit of this nature may be maintained only when the prime contractor has reimbursed its subcontractor for the latter's damages or remains liable for such reimbursement in the future. These are the only ways in which the damages of the subcontractor can become, in turn, the damages of the prime contractor, for which recovery may be had against the Government. Thus, when the subcontract contains a clause completely exonerating a prime contractor from liability to its subcontractor for the damage complained of, suit cannot be maintained by the prime contractor against the Government. The same result will follow when the subcontract provides for a complete release of the prime contractor's liability to the subcontractor upon the granting of additional time for the latter's performance, or the acceptance of final payment by the latter.

158 Ct.Cl. 393, 390–400, 304 F.2d at 888–89 (citations omitted); *see George Hyman Construction Co. v. United States,* 30 Fed.Cl. 170, 174 (1993) (quoting same and citing *Keydata Corp. v. United States,* 205 Ct.Cl. 467, 504 F.2d 1115, 1120–21 (1974); *J.W. Bateson Co. v. United States,* 143 Ct.Cl. 228, 163 F.Supp. 871 (1958); *Pearson, Dickerson, Inc. v. United States,* 115 Ct.Cl. 236, 253–54, 263, (1950)), *aff'd,* 39 F.3d 1197 (Fed.Cir.1994). The court in *J. L. Simmons Co. v. United States,* further elaborated as to these releases:

> it is apparent that, insofar as they relate to these particular claims, the releases are clearly conditional or contingent in nature. They become operable only if and when plaintiff prosecutes these very claims against the Government to a final judg-ment. Even then, if the claims are found meritorious, plaintiff's liability is not extinguished until actual payment is made to the subcontractors. Thus, the releases neither exonerate plaintiff from liability *ab initio* nor subsequently, but do impose certain obligations on plaintiff which it must fulfill before its duty to reimburse these subcontractors for the damage allegedly caused by the Government is extinguished. It is apparent, then, that plaintiff is presently subject to liability on these claims and will continue to be so until liability is extinguished in accord with the method agreed to by the parties.

158 Ct.Cl. 393, 400, 304 F.2d at 890. Noteworthy also is the discussion in *George Hyman Construction Co. v. United States,* 30 Fed.Cl. 170, regarding a contractor's conditional liability to the subcontractor:

> Of course, the "liability" presumed in *Simmons* is, under current practice, a mere fiction. In fact, the contractor is exposed to no liability because in most of these cases, including this, only the subcontractor's own attorneys actually prosecute the suit, at the subcontractor's sole expense, and the contractor is not even exposed to liability for a false certification since it is permitted to qualify its certification of the claim under the CDA by relying on the subcontractor's representations. *See Transamerica Ins. Corp. v. United States,* 973 F.2d 1572, 1580 (Fed.Cir.1992). Thus, if the contractor lends his name to the suit, there is no set of circumstances for which the contractor can be monetarily liable.

30 Fed. Cl. at 176 n. 11. Nevertheless, this conditional liability pursuant to a release agreement was expressly stated as an exception to the *Severin* Doctrine. *See also J.L. Simmons Co. v. United States,* 158 Ct.Cl. at 398–400, 304 F.2d at 890. Thus, a suit is permissible in the United States Court of Federal Claims by a contractor on behalf of its subcontractor when a "contractor has agreed to reimburse its subcontractor for damages it has suffered at the hands of the Government, but only as and when the former receives payment for them from the Government." 158 Ct.Cl. at 398, 304 F.2d at 889.

The United States Claims Court, applied this exception to the *Severin* Doctrine in a case with factual similarity to the above-captioned case:

> The instant case falls into this category as the settlement agreement executed by Worthington [, the prime contractor,] and Pan Arctic [, the subcontractor,] is not the complete exoneration required by the Severin Doctrine. Rather than extinguishing the liability between the parties, the settlement agreement merely defines the manner in which that liability is to be extinguished. *See J.L. Simmons*, 304 F.2d 886, 158 Ct.Cl. at 400. The agreement imposes certain obligations on both Worthington and Pan Arctic regarding the pursuit of their claims against the government. Specifically, the agreement provides that although Pan Arctic will formally prosecute the claims, Worthington will complete preparation of its own claims and produce all necessary documents. Moreover, it delineates the manner in which any potential recovery would be distributed among the parties to the agreement. Implicit in this agreement, therefore, is a recognition that Worthington remains liable to Pan Arctic, in accord with the terms of the agreement, for its claims against the government. *See id.* Such "conditional liability" on the part of Worthington is sufficient under the noted precedent to permit Worthington to sue in this court. The fact that the settlement agreement also purports to assign Worthington's claims against the government to Pan Arctic does not mandate application of the Severin Doctrine. *See Folk Construction Co. v. United States*, 2 Cl.Ct. 681, 685–86 (1983).

*Pan Arctic Corp. v. United States*, 8 Cl.Ct. 546, 548–49 (1985).

■ In order to understand the application of the *Severin* Doctrine, the analysis in *Pan Arctic Corp. v. United States* should be read together with the statements of the court in *J. L. Simmons Co. v. United States* that "when the subcontract contains a clause completely exonerating a prime contractor from liability to its subcontractor for the damage complained of, suit cannot be maintained by the prime contractor against the Government." 158 Ct.Cl. 393, 397–98, 304 F.2d at 888–89.

■ The Order of the United States District Court for the Territory of Guam, dated August 26, 1992, in the case brought by the subcontractor, Jericho, against the contractor, Kentucky, and the surety, summed up the posture of Kentucky and Jericho in the settlement agreement relevant to their claims against the government, as follows:

1. This action [,the District Court of Guam action,] shall be stayed until the parties move for dismissal pursuant to the Settlement Agreement.

2. The parties have agreed that for the period of the stay, no party will initiate or pursue any litigation, action, or proceeding relating to their breach of contract, fraud or bad faith dispute including the action identified above until after a status conference with the Court and in accordance with any scheduling order the Court may order with the exception that (i) during the period of the stay, the parties may take *de bene esse* depositions to preserve the testimony of any individual who is ill or infirm (each party has the obligation to identify any individual of whom the parties become aware through the ordinary course of business is ill or infirm and whose depositions the party believes should be taken pursuant to this order); and (ii) the parties agree that the stay does not apply to discovery of documents held by third parties.

3. During the stay of the litigation, *the parties have agreed to cooperate in the pursuit of the parties' collective claims against the United States Air Force.*

4. *The parties have agreed to produce the necessary documents required to pursue their claims against the Air Force.*

5. This Order is being entered pursuant to the representation of the parties that they have reached a settlement of this action as to all claims and all parties. *In order to effectuate the settlement agreement, however, the parties require an opportunity to pursue the underlying claims which exist against the United States government* and therefore seek a stay of the action. A stay of the action is in the best

interest of all parties, as well as judicial economy. This settlement agreement will eliminate the need for the Pretrial Conference and the Summary Judgment Motion hearings which are scheduled for September 4, 1992. The settlement and stay will also eliminate the need for the trial which is scheduled for September 8, 1992.

(emphasis added). This Order by the United States District Court for the Territory of Guam confirms the notion that the settlement agreement imposes conditional liability on the prime contractor, Kentucky, in that it mandates future cooperation, document recovery, litigation support, and other requirements articulated in the settlement agreement in order to achieve final resolution of the dispute between the contractor and subcontractor. Moreover, the settlement agreement language imposes specific obligations on the parties, as follows:

III. The parties shall jointly move the District Court for Guam for an Order staying all proceedings until such time as all matters involved with the claims, modifications and Termination for Convenience have been resolved, including appeals, and all payments received from the Air Force have been paid into Court and disbursed according to this Agreement. At that time, all of the above referenced actions shall be dismissed with prejudice.

\* \* \*

V. Jericho Painting and Special Coating Company, Inc. shall be designated as the real party in interest and authorized to pursue its claim and the claim of Kentucky Bridge under Contract No. F64133–90–C0015, for the painting of POL pipeline in the Territory of Guam through the Department of the Air Force. To the extent permitted by law, Jericho shall include in the claim and use its best efforts to recover Kentucky Bridge's claim for labor, equipment, materials, overhead, profit, attorneys fees, costs, F & D's [,Fidelity's,] attorneys fees, and F & D's costs.

VI. Kentucky Bridge ... agrees to fully cooperate in the presentation of the claim to the Air Force. Jericho shall agree to keep Kentucky Bridge advised of the progress of the claim and Kentucky Bridge and its attorneys shall be entitled to participate therein, however, Jericho's shall have full discretion as to the disposition of the claim.

\* \* \*

X. All sums recovered by Jericho or Kentucky Bridge from the Air Force shall be paid into the District Court of Guam and shall be considered trust funds to be distributed immediately as received by the Court as follows:

A. The first $135,000 plus $250,000 shall be paid to F & D to reimburse F & D for payment made to Anchor Pattern International under the Payment Bond issued herein and F & D accepts this amount as full payment.

B. The next $165,000 shall be paid to Kentucky Bridge.

C. Next to Kentucky Bridge or to its attorney, Laurence J. Zielke, its costs and attorneys' fees, including any costs and attorneys' fees incurred in assisting Jericho in the prosecution of the claims against the Air Force.

Next to F & D in reimbursement of its costs and attorney's fees less 15% thereof, said 15% to be paid to Jericho; and

All remaining sums to Jericho.

It is apparent to the court that under the settlement agreement, Kentucky agreed that it should assist Jericho to litigate against the defendant in the instant action, as the real party in interest. The contractor and the subcontractor also agreed on the manner and distribution of any monies to be recovered from the government. In sum, the language of the settlement agreement indicates that Kentucky and Jericho "agreed to cooperate in the pursuit of the parties' collective claims against the United States Air Force." Thus the settlement agreement, notwithstanding any other possible waivers, imposes obligations and liability upon Kentucky for the future, and the *Severin* Doctrine does not apply. Conditional liability of the type assumed by Kentucky is considered sufficient liability to avoid application of the *Severin* Doctrine. *J.L. Simmons Co. v. United States,* 158 Ct.Cl. at 398–400, 304 F.2d at 890.

The defendant's motion for summary judgment premised upon the *Severin* Doctrine should be rejected.

### CONCLUSION

For the aforementioned reasons, the court, hereby **DENIES**, the defendant's motion to dismiss on Count I and the defendant's motion for summary judgment on Counts I and II.

**IT IS SO ORDERED**